**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TRUMP TAJ MAHAL ASSOCIATES, a New Jersey Limited Partnership, d/b/a Trump Taj Mahal Casino Resort, Respondent.**

**No. 92–3616.**

United States Court of Appeals, Third Circuit.

Argued March 17, 1993.

Decided July 12, 1993.

Peter Winkler, Supervisory Atty., Margaret Luke (argued), Atty., Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Harriet Lipkin, Debbie Pitcher (argued), Pantaleo & Lipkin, Washington, D.C., for respondent.

Before: STAPLETON, ROTH and LEWIS, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

The National Labor Relations Board (the "Board") petitions for enforcement of its order directing Trump Taj Mahal Casino Resort (the "Taj Mahal") to cease and desist from its refusal to recognize and bargain with the International Alliance of Theatrical Stage Employees, Local 917, and the International Union of Operating Engineers, Local 68A (jointly, the "Union") in violation of 29 U.S.C. §§ 158(a)(5) and (1). The order also directs the Company, upon request, to bargain collectively with the Union and to post a remedial notice. In issuing this order, the Board treated its determination of the appropriate composition of the bargaining unit seeking representation as determinative of whether the Company violated 29 U.S.C. §§ 158(a)(5) and (1) by refusing to recognize and bargain with the Union. Accordingly, we will focus on the Board's determination of the appropriate bargaining unit.

### I.

The Taj Mahal is a hotel and casino in Atlantic City, New Jersey, that regularly provides shows, acts, parties and other entertainment for its patrons. The Taj Mahal employs a number of "entertainment technicians", who help in the production of the entertainment. Their tasks generally include, *inter alia*, the loading and unloading of equipment for a show, the operation of that equipment during a show, and the management of stage props and settings. The Taj Mahal also employs a number of ticket

takers, ushers and box office clerks in its entertainment department.

The Taj Mahal opened on April 2, 1990. At that time it employed eight full-time entertainment technicians and frequently used the services of a group of on-call technicians.[1] These on-call technicians performed substantially the same tasks as the full time technicians. They received a higher hourly wage than full time technicians, but they received no fringe benefits.

After some discussion about how to make its entertainment division more cost effective, Taj Mahal's management determined that it would be more efficient to increase the number of regularly employed technicians and thereby decrease its need for on-call employees. Accordingly, on March 1, 1991 the Taj Mahal increased its full time entertainment technician staff from eight to twenty-eight, and also took on ten regular part-time employees who were to work 24 to 30 hours per week.

On February 28, 1991, the Union submitted a representation petition to the Board, seeking to represent "all full time and regular part time entertainment and audio visual technicians and group leaders employed by the employer at its Atlantic City, New Jersey facility." (App. at p. 13.)

The Regional Director of the Board conducted a representation proceeding on March 22, 1991. At that proceeding the Taj Mahal argued both that the appropriate collective bargaining unit should include the regularly employed ticket takers, ushers and box office clerks, and that the appropriate collective bargaining unit should exclude all on-call technicians. In support of their claim that the on-call technicians should be excluded from the unit, the Taj Mahal argued that, given the recent and dramatic increase in full time and regular part-time workers, the on-call technicians could not reasonably expect to receive sufficient future employment to place them in a community of interest with the full time and regular part-time technicians who properly belonged in the unit.

The Regional Director, in an opinion released on April 19, 1991, held that the entertainment technicians perform a type of work that is entirely different from the work of ushers, ticket takers and box office workers, and so the technicians properly constituted a separate unit. He further held that the collective bargaining unit should include both full time and "regular part-time technicians", defining the latter category to include those on-call technicians who had worked an average of four hours a week during the preceding quarter. The opinion of the Regional Director notes the Taj Mahal's substantial increase in its staff of regular entertainment technicians on March 1, 1991 and the testimony of the Taj Mahal's stage manager that "the number of hours worked by casuals will decrease in the future and ... that casuals will work from once or twice a month to once every two or three months." (App. at p. 40.)

The Board limited its review of the Regional Director's decision to the issue of whether the unit approved by him improperly included some on-call technicians. The Board thus affirmed, *sub silentio*, the Regional Director's conclusion that the ticket takers, ushers, and box office clerks did not belong in the same unit with the entertainment technicians.

The Board initially noted that, in "determining whether on-call employees should be included in the bargaining unit, the Board considers whether the employees perform unit work *and* those employees' regularity of employment." (App. at p. 113A, emphasis in original.) Observing that there was no dispute that the on-call employees in this case performed unit work, the Board moved to a consideration of the regularity of their employment. It concluded that the Regional Director, by including in the unit only those on-call employees who had worked an average of four hours a week during the prior three months, had satisfactorily provided for regularity of employment and a community

1. Because casinos are a regulated industry, the Taj Mahal is not capable of instantaneously hiring qualified technicians to satisfy short-term labor needs. All employees must be licensed by the Casino Control Commission, and all casuals must be "badged" by the Taj Mahal. Thus, the Taj Mahal must be able to draw from a pool of technicians who have already gone through the procedural requirements in order to satisfy short-term needs.

of interests on the part of those in the bargaining unit. The Board noted that the Regional Director's definition of "regular part-time technicians" was derived from "the Board's traditional eligibility formula for on-call employees as set forth in *Davison–Paxon Co.*, 185 NLRB 21, 23–24 (1970)."[2] (App. at p. 112.)

The Union was certified as the bargaining representative on March 3, 1992. Thereafter the Taj Mahal refused to recognize or bargain with the Union. The Board found the Taj Mahal's refusal to be in violation of 29 U.S.C. §§ 158(a)(5) and (1) and issued an order directing the Taj Mahal to cease and desist from its unlawful practices and, upon request, to bargain with the Union. The Board now petitions this Court for the enforcement of its order.

## II.

The Board had jurisdiction over this case pursuant to 29 U.S.C. § 160(a). This Court has jurisdiction under 29 U.S.C. § 160(e), as the allegedly unfair labor practices took place in Atlantic City, New Jersey.

## III.

We agree with the Taj Mahal that workers in a bargaining unit should share a community of interest. *See generally NLRB v. St. Francis College*, 562 F.2d 246 (3d Cir. 1977). We further agree with it that workers who have no reasonable expectation of working in the same workplace in the future cannot share a community of interest. *See Berlitz School of Languages of America*, 231 NLRB 766, 767 (1977) ("In determining the proper eligibility standard ... the Board must consider whether Employees have a reasonable expectation of future employment."); *Connecticut Distributors, Inc.*, 255 NLRB 1255, 1261–62 (1981) ("employees ... who do not have a work history to reveal a reasonable expectation of future employment,

or who do not have such reasonable expectation otherwise, are excluded from the bargaining unit"), *enf. denied on other grounds*, 681 F.2d 127 (2d Cir.1982); *Mariposa Press*, 273 NLRB 528, 530–31 n. 12 (1984) ("... there is no evidence in the record showing that [the disputed workers] have any reasonable expectation of continued employment."). We do not read the opinion of the Regional Director or the opinion of the Board, however, to be inconsistent with either of these precepts.

Taj Mahal's argument misconceives the nature of the Board's task when defining a bargaining unit and certifying an exclusive representative for the employees in that unit. The Board's responsibility is to identify a group of positions such that those serving in the unit can reasonably be expected to share a community of interest *over time*. The bargaining unit, as defined by the Board, exists until such time as it is redefined or terminated by the Board or voluntarily abandoned by parties. It establishes at any given time during that period the employees who cannot bargain for themselves and are bound by the product of the collective bargaining process, the employees to whom the union owes a duty of fair representation, and the employees who can petition and vote for decertification. The bargaining unit must thus be defined in a way that allows the definition to be applied at different points during the life of the bargaining unit.

In resolving the issue of whether less than full time technicians share a community of interest with full time technicians and should, therefore, be included in the bargaining unit in this case, the Board was concerned not only about whether the part-time employees did the same work as full time technicians but also about whether the part-time employees were employed with sufficient regularity to have interests similar to those of the full time employees. By includ-

2. The *Davison–Paxson* formula provides that a part-time employee holding a position in the bargaining unit will be eligible to vote in an election if he or she has worked an average of four hours a week during the quarter preceding the eligibility date. The "eligibility date" is generally the payroll period immediately preceding

the direction of an election. *See Employment Coordinator* ¶ LR–17,485 (2/15/93). Since the opinion of the Regional Director, dated April 19, 1991, directed the election, we have assumed that the relevant eligibility period ran from about mid-January to about mid-April of 1991.

ing both full and "regular part-time technicians" and defining "regular part-time technicians" to mean only those part time employees who have averaged four hours of work per week during the preceding quarter, the Board assured that part-time positions will be included in the unit only to the extent there are employees who both do the same work as full time employees *and* are currently being called in with some regularity.

The Taj Mahal cannot persuasively argue that this is an arbitrary approach to defining a bargaining unit. The Board's formula is sensitive to the fact that employees must work together in order to share a community of interest. There is an undeniable correlation between shared interests and regularity in the employment of part-time workers, a correlation that exists without regard to the number of full time technicians employed by Taj Mahal. Whether the Taj Mahal has 8, 28, or some other number of full time technicians may have a bearing on how many part-time technicians will at any point in time be working an average of four hours per week, but it has no bearing on whether those in fact working an average of four hours per week have a community of interest with full time technicians. To be sure, because the Board's formula relies upon the experience of the past quarter as a proxy for what the future can reasonably be expected to hold, the Board's formula will not provide 100% assurance that all those serving in the unit will have at any given point a reasonable expectation of future employment, but that fact is inherent in the task of providing a bargaining unit definition for application over time.

We do not understand Taj Mahal's argument to be that the Board's formula will not over time produce a bargaining unit having a community of interest. It does not assert that, in most instances, workers who have worked an average of more than four hours per week in the preceding quarter will not have a reasonable expectation of sufficient future employment to assure a community of interest. Rather, Taj Mahal argues that, because of a discontinuity in its business operations, application of the four hour average per week definition in the particular context of the quarter preceding the eligibility date for the initial representation election

may have resulted in people voting in that initial representation election who did not have a reasonable expectation of future employment. While that may well be the case, it does not reflect a defect in the Board's definition of the bargaining unit any more than would the fact that a full time technician may have voted with full knowledge that he would change employers the following week. When determining a bargaining unit, the Board's responsibility is to designate a group of positions such that over time one can reasonably expect there to be a community of interest in the unit. The Board has acted reasonably here in fulfilling that responsibility, and we will not disturb its certification.

The Taj Mahal has argued before us, though not before the Board, that the risk of someone voting who has no reasonable expectation of future employment could be reduced if the Board were to amend its definition of a "regular part-time technician" to require, in place of the four hour average requirement, a minimum number of hours of employment *in each week* of the prior quarter. In situations in which there is a change during the quarter that materially reduces the need for part-time technicians, this would indeed reduce the risk of a technician voting who had no reasonable expectation of future employment. It would, however, eliminate anyone who happened to go a week without a recall, regardless of how much work he or she performed during the rest of the quarter. It would thus exclude many part-time technicians who did have a community of interest with full time technicians. Moreover, when applied in the vast majority of situations—those in which there was no drastic change during the relevant quarter—this undesirable underinclusion would occur without an offsetting benefit. Most importantly, the trade-off decisions are for the Board, and we defer to its judgment so long as there is a rational basis for the path chosen. There is such a rational basis here.

### IV.

The Board's bargaining order will be enforced.