**B B & L, Inc., Petitioner**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 93–1479.

United States Court of Appeals, District of Columbia Circuit.

Argued March 3, 1995.

Decided April 25, 1995.

Patrick W. Ritchey, Pittsburgh, PA, argued the cause for the petitioner. On brief was Brooke Bashore–Smith, Newark, DE. Peter D. Post, Pittsburgh, PA, entered an appearance.

Joseph J. Jablonski, Jr., Atty., N.L.R.B., Washington, DC, argued the cause for the respondent. On brief were Linda R. Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, DC.

Before WILLIAMS, HENDERSON and TATEL, Circuit Judges.

Circuit Judge TATEL filed a separate opinion concurring in part and dissenting in part.

PER CURIAM:

B B & L, Inc. (B B & L) petitions for review of an order of the National Labor Relations Board (NLRB or Board) holding that B B & L violated sections 8(a)(1), (5) and 2(6), (7) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5) and 152(6), (7), by refusing to bargain with the Drivers and Employees of the Petroleum Industry, Local Union No. 273 a/w International Brotherhood of Teamsters, AFL–CIO (Union) after the Union had been certified as the exclusive bargaining representative of B B & L's full-time and regular part-time truck drivers at its Coraopolis, Pennsylvania terminal. Specifically, B B & L objects to the Board's conclusion that a part-time, on-call truck driver was ineligible to vote in the union certification election because he had not worked an average of four hours per week during the quarter preceding the election eligibility date. The Board has cross-petitioned for enforcement of its order. As more fully set out below, we conclude that the Board did not—and cannot—justify its rigid adherence to the "four-hour rule" in light of its past flexible treatment of similarly situated employees. Accordingly, we grant B B & L's petition for review and deny the Board's cross-petition for enforcement.

I.

In early May 1992, B B & L and the Union entered into a stipulated election agreement to determine whether the Union would represent B B & L's full-time and regular part-time Coraopolis truck drivers. The agreement provided for mail-in voting by eligible drivers employed during the payroll period ending May 2, 1992. Twelve ballots were cast and of the eleven counted six favored Union representation, while five opposed it. The twelfth ballot, submitted by Kenneth Musgrave, B B & L's sole part-time driver, was challenged by the Union on the ground that he worked so few hours in the quarter preceding the election that he lacked sufficient interest in the bargaining unit to vote in the representation election. Because Musgrave's vote could determine the election's outcome, the Board's regional director began an investigation of Musgrave's eligibility and referred the matter for hearing.

A hearing was held on July 28, 1992 and on September 10, 1992 the hearing officer issued

a report finding that Musgrave was an on-call employee and that he failed to satisfy the Board's eligibility test under which " 'on-call' employees are eligible to vote if they share a community of interest with the other bargaining unit employees and average four hours of work per week in the quarter preceding the election." Joint Appendix (JA) 291 (citations omitted). While assuming that Musgrave otherwise shared a community of interest, the hearing officer recommended that the Board sustain the Union's challenge to Musgrave's ballot and certify the Union because Musgrave had averaged fewer than four hours of work per week in the first quarter of 1992, the last full quarter before the election.

By order dated March 1, 1993, the Board adopted the hearing officer's recommendations and findings, while noting she had mischaracterized Board precedent as requiring that Musgrave average four hours of work per week in the quarter preceding the election rather than in the quarter preceding the eligibility date.[1]

Despite the certification order, B B & L refused to bargain with the Union, claiming the certification was invalid because Musgrave's ballot should have been counted. As a result, the Union filed an unfair labor practice charge against B B & L.[2] In an order dated July 19, 1993 the Board granted summary judgment in the Union's favor, concluding that B B & L raised no new ground or special circumstance that warranted reexamination of the certification decision and that, because the Union had been properly certified, B B & L committed an unfair labor practice by refusing to bargain with it. B B & L admits its refusal to bargain but petitions for review of the summary judgment on the ground that Musgrave's disqualification was arbitrary.

1. The Board determined that "[t]his inadvertent error does not affect the result." JA 330 n. 1.

2. Refusing to bargain and thereby engendering an unfair labor practice complaint is the standard route to challenge a certification order, which is not subject to direct review. *See, e.g., St. Margaret Memorial Hosp. v. NLRB,* 991 F.2d

## II.

The court has jurisdiction over B B & L's petition for review under 29 U.S.C. § 160(f) and over the Board's cross-application for enforcement under 29 U.S.C. § 160(e). The Board exercises broad discretion when determining the composition of the bargaining unit under 29 U.S.C. § 159(b). *See Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). We will uphold the Board's exercise of discretion unless its action is unreasonable, arbitrary or unsupported by the evidence. *NLRB v. Mar Salle, Inc.,* 425 F.2d 566, 569 (D.C.Cir.1970); *NLRB v. L & B Cooling, Inc.,* 757 F.2d 236, 241 (10th Cir.1985); *Justak Bros. & Co. v. NLRB,* 664 F.2d 1074, 1079 (7th Cir.1981); *Kendall College v. NLRB,* 570 F.2d 216, 219 (7th Cir. 1978). We must therefore uphold a Board decision if it is rational and in accord with past precedent. *International Union of Elec., Radio & Mach. Workers v. NLRB,* 604 F.2d 689, 695 (D.C.Cir.1979). Nevertheless, the Board cannot ignore its own relevant precedent but must explain why it is not controlling. *Cleveland Constr. Co. v. NLRB,* 44 F.3d 1010, 1016 (D.C.Cir.1995).

The Board has long applied a general rule that temporary, seasonal or contingent employees are not part of a unit comprised of regular and part-time employees, and therefore are not eligible to vote in a representation election, unless they average four or more hours of work per week during the quarter preceding the election eligibility date. *See Saratoga County Chapter NYS-ARC, Inc.,* 314 N.L.R.B. 609, 609, 1994 WL 395263 (1994); *Trump Taj Mahal Assocs.,* 306 N.L.R.B. 294, 296, 1992 WL 27705 (1992), *enforced,* 2 F.3d 35 (3d Cir.1993); *V.I.P. Movers, Inc.,* 232 N.L.R.B. 14, 14–15, 1977 WL 9069 (1977); *Davison–Paxon Co.,* 185 N.L.R.B. 21 (1970); *Allied Stores of Ohio, Inc.,* 175 N.L.R.B. 966, 969 (1969); *May*

1146, 1151 n. 5 (3d Cir.1993); *Pony Express Courier, Corp. v. NLRB,* 981 F.2d 358, 361–62 (8th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2441, 124 L.Ed.2d 659 (1993); *Twin City Hosp. Corp. v. NLRB,* 889 F.2d 1557, 1559 n. 2 (6th Cir.1989); *Friendly Ice Cream Corp. v. NLRB,* 705 F.2d 570, 574 n. 3 (1st Cir.1983).

*Dep't Stores Co.*, 175 N.L.R.B. 514, 517 (1969). The parties agree that if the Board's four-hour formula is strictly applied, Musgrave's vote must be discounted. Nevertheless, B B & L maintains the mechanical application of the formula here was inconsistent with the agency's own precedent and must therefore be reversed. We agree.

■ The four-hour formula is based on the rational premise that employees who work fewer than four hours per week generally lack sufficient continuity and regularity of employment to establish community of interest with other unit employees. *Trump Taj Mahal Assocs.*, 306 N.L.R.B. at 296; *Saratoga*, 314 N.L.R.B. at 609.[3] Further, by circumscribing the period relevant to eligibility (namely, the last full quarter before the eligibility date), the formula makes a Board's eligibility determinations more predictable. On the other hand, while the Board has expressly found the formula a reliable test for on-call employees, *Trump Taj Mahal*, 306 N.L.R.B. at 295, it has also emphasized that "no single eligibility formula must be used in all cases, [although] the [four-hour] formula is the one most frequently used, absent a showing of special circumstances." *Saratoga*, 314 N.L.R.B. at 609. Accordingly, the Board has "devised an inclusive—not exclusive—eligibility formula to permit optimum employee enfranchisement and free choice, without enfranchising individuals with no real continuing interest in the terms and conditions of employment offered by the employer." *Trump Taj Mahal*, 306 N.L.R.B. at 296. Pursuing its goal of reasonable inclusiveness, the Board has acknowledged an "obligation to tailor [its] general eligibility formulas to the particular facts of the case," *American Zoetrope Prods., Inc.*, 207 N.L.R.B. 621, 623, 1973 WL 4656 (1973), and has done so repeatedly with the four-hour formula.

For example, in *Medion, Inc.*, 200 N.L.R.B. 1013, 1972 WL 4728 (1972), when confronted with an irregular pattern of employment, the Board formulated special eligibility requirements for film production employees. The Board declined to apply the four-hour rule and instead found eligible "all employees who were employed by the Employer on at least two productions for a minimum of 5 working days during the year preceding the [election decision]." *Id.* at 1014. The following year, the Board found even the *Medion* standard too rigorous for a unit of employees working primarily in television commercial production and modified it to require only that an employee had worked on two productions, regardless of the actual number of days worked. *American Zoetrope Prods., Inc.*, 207 N.L.R.B. 621, 623, 1973 WL 4656 (1973). In both cases, the Board recognized its "responsibility to devise an eligibility formula which will protect and give full effect to the voting rights of those employees who have a reasonable expectancy of further employment with the Employer." *Id.* at 622; *Medion*, 200 N.L.R.B. at 1014.

More instructive here are Board decisions addressing the eligibility of newly hired employees and those on leave during the quarter preceding the eligibility date. In *Stockham Valve & Fittings, Inc.*, 222 N.L.R.B. 217, 218–19, 1976 WL 6588 (1976), the Board found that employees hired less than one month before the election were eligible to vote based on the number of hours they had worked between their dates of hire and the election. Later, in *Pat's Blue Ribbons & Trophies*, 286 N.L.R.B. 918 (1987), the Board found two employees eligible to vote despite not having averaged four hours of work per week during the quarter preceding the election. One employee, hired approximately one month before the end of the relevant quarter, was found eligible based in part on the fact that she worked 73 hours during that month. *Id.* at 918–19. The second employ-

---

**3.** Continuity and regularity of employment are two of the factors considered in determining community of interest; others include the employee's duties, supervision and pay. *See Tri-State Transp. Co.*, 289 N.L.R.B. 356, 356–57, 1988 WL 213763 (1988); *Pat's Blue Ribbons & Trophies*, 286 N.L.R.B. 918, 918–19, 1987 WL 90018 (1987). In this regard, the hearing officer misstated the formula by requiring that the challenged employee "share a community of interest with the other bargaining unit employees *and* average four hours of work per week in the quarter preceding the election." JA 291 (emphasis added). The Board's statement is·different, with the four-hour requirement used to demonstrate the employee's community of interest.

ee, who was hired long before the election but was on an extended maternity leave until the last month of the relevant quarter, was also found eligible, based on her 43 hours' work during the final month of the quarter and on the hours she had worked in the two months before her leave. *Id.* at 919 & n. 9. Similarly, when faced with an employee who was on leave on both the eligibility date and the election date, the Board found "that the appropriate standard is whether [the employee] regularly averaged 4 hours or more of work per week during the quarter prior to her leave." *Northern California Visiting Nurses Ass'n.*, 299 N.L.R.B. 980, 980, 1990 WL 152968 (1990). Finally, and perhaps most telling here, in *Beverly Enters.–Mass., Inc.*, 310 N.L.R.B. 538, 1993 WL 53771 (1993), the Board found an on-call employee eligible to vote in a union election because she worked "11.5 hours in the week prior to the eligibility date and averaged over 7 hours weekly *between the eligibility and election dates,*" yielding a "*projected* average[ ] of more than 4 hours per week during the calendar quarter prior to the eligibility date." *Id.* at 538 n. 3.

Here, Musgrave was hired in August 1991 to replace Charles Troutman who had earlier announced his intent to retire before April 1, 1992 and who in fact retired on March 31, 1992. Troutman, an on-call driver, worked more than the requisite four-hour weekly average during each of the last two quarters before his retirement, including the first quarter of 1992. In the quarter after Troutman retired—the quarter during which the election took place—Musgrave too averaged more than four hours per week. In other words, Musgrave was hired to fill a position that consistently required more than the

minimum four-hour weekly average during a given quarter and he met that minimum once his predecessor retired and he became, as intended, the terminal's sole on-call driver. Thus, there can be little question that Musgrave's employment was continuous and regular, in that it required more than four hours of work per week on average, and that Musgrave therefore shared a community of interest with the other Coraopolis drivers.[4] It is only because he was hired in anticipation of Troutman's retirement—and consequently worked alongside Troutman until April 1—that he averaged fewer than four hours during the first quarter of 1992, the only period examined by the Board. This is precisely the kind of "special circumstance" that the Board has previously found requires flexible application of the four-hour formula, consistent with its stated goal of "permit[ting] optimum employee enfranchisement and free choice, without enfranchising individuals with no real continuing interest in the terms and conditions of employment offered by the employer." *Trump Taj Mahal*, 306 N.L.R.B. at 296. Had the Board followed precedent and projected Musgrave's quarterly work record based on the hours worked from that time until the election, as it has for other employees prevented from working their full normal hours during the relevant quarter, Musgrave would have been deemed eligible to vote under the Board's four-hour formula. The Board's failure to do so is inexplicable.[5]

In sum, the Board has deviated from its usual formula, which focuses on the employee's work pattern in the quarter preceding the eligibility date, in cases involving pregnant workers on leave, newly hired workers and workers in an industry with

4. No one disputes the adequacy here of other factors considered in determining community of interest. *See supra* note 3.

5. Given the Board's insistence on "inclusive" eligibility criteria, its refusal in *Trump Taj Mahal* to determine community of interest by percentage of days or weeks, rather than average hours, worked and its focus in *Beverly Enters.* and *Stockham Valve* on the period between the eligibility date and the election, the Board could not, as the dissent suggests, find Musgrave ineligible on the ground that he worked only one day between Troutman's retirement on April 1 and

the eligibility date of May 2. The employee found eligible in *Beverly Enters.* worked 11.5 hours in the week before the eligibility date and an average of 7 hours weekly between the eligibility date and the election; Musgrave worked 10 hours in the week before the eligibility date and an average of about 9 hours weekly between the eligibility date and the election. That Musgrave worked only one day between April 1 and the eligibility date is of no significance as the Board appears *never* to have used the period between a relevant change of circumstance and the eligibility date as a basis for *excluding* workers.

irregular employment patterns. While the Board is entitled to make such exceptions, it cannot do so arbitrarily. The Board is required to explain the principle or principles supporting its exceptions and it has: In each instance, the Board has suggested that special circumstances made its usual formula an inaccurate indicator of the employee's "expectancy of" or "continuing" or "projected" community of interest with other employees. Based on this principle—the only principle we can find motivating the exceptions—we do not see any rational basis for treating Musgrave differently from new hires and the temporarily separated employee in *Beverly Enters.*[6] We therefore conclude that the decision to set aside Musgrave's vote was arbitrary. Accordingly, we grant the petition for review, reversing that decision, and deny the cross-petition for enforcement.

*So ordered.*

TATEL, Circuit Judge, concurring in part and dissenting in part:

I agree that the Board failed to explain its decision adequately, and thus concur with the majority's denial of the Board's petition for enforcement. But because I think it is possible for the Board to set forth a rational and consistent explanation for not counting Musgrave's ballot, I would remand to the Board for further explanation.

The Board's main flaw was not that it improperly applied the law, but that it failed to explain why it did not follow the flexible approach it has taken in some past cases. As I read those cases, the Board has deviated from the four-hour rule in three specific circumstances: 1) where employment in the particular industry is by its nature sporadic, *see Trump Taj Mahal Assocs.*, 306 N.L.R.B. 294, 296 ("Finally, the Board has been flexible in carrying out its responsibility to devise formulas suited to unique conditions in the entertainment industry, as in other specialized industries, to afford employees ... the optimum opportunity for meaningful representation."), *enforced*, 2 F.3d 35 (3d Cir. 1993); *American Zoetrope Prods., Inc.*, 207 N.L.R.B. 621 (1973); *Medion, Inc.*, 200 N.L.R.B. 1013 (1972); 2) where individual employees have reduced their workload for personal reasons, e.g. maternity and other personal leave, and where those employees worked on a sufficiently regular basis both before and after their leave, *see Northern Calif. Visiting Nurses Ass'n*, 299 N.L.R.B. 980, 980–81 (1990) (personal leave/vacation); *Pat's Blue Ribbons*, 286 N.L.R.B. 918, 919 (1987) (maternity leave), and; 3) where the employees were new hires who began work prior to the eligibility date and where their work since being hired has been sufficiently regular. *See Beverly Enters.–Mass., Inc.*, 310 N.L.R.B. 538, 538 n. 3 (1993); *Pat's Blue Ribbons*, 286 N.L.R.B. at 919; *Stockham Valve & Fittings, Inc.*, 222 N.L.R.B. 217, 218–19 (1976).

The responsibility for deciding whether one of these exceptions applies, or a more general exception implicit in them, is the Board's, not ours. We should take that responsibility from the Board—that is, reverse without remanding—only if we are sure that no way exists for it to reasonably articulate a basis for excluding Musgrave's ballot. This is not such a case.

The Board could reasonably find, for example, that the first two exceptions do not apply because B B & L's business is not sporadic, and because Musgrave's irregular work was not due to personal circumstances. As for the third exception, the Board could conclude that Musgrave was clearly not a "new hire" in the sense of *Stockham Valve* or *Pat's Blue Ribbons* since he was working for B B & L on a casual basis for seven months

---

6. In its brief, the Board was not responsive on this issue. Regarding new hires, the Board stated: "The Court should also reject the Company's implicit attempt to have this Court measure Musgrave's voter eligibility as if he were a newly hired employee. Simply put, as the Company concedes, Musgrave was not a newly hired employee—he became an on-call employee in August 1991...." NLRB Brief at 20 (footnote omitted). The Board was no more expansive in discussing temporary, laid-off or seasonal employees: "Musgrave was neither a temporary, nor a laid-off, nor a seasonal employee. Rather, he was a casual or on-call driver who had worked for a non-seasonal employer since August 1991." *Id.* at 22. In each case, the Board simply noted that Musgrave's status differs from that of other employees who have been treated differently, without explaining why the difference is significant.

prior to the eligibility date. The Board is not necessarily required to apply its more flexible "new hire" analysis to this case merely because Troutman, who Musgrave was hired to replace, retired on March 31. Nothing happened between that day and the eligibility date, May 2, that would force the Board to conclude that Musgrave suddenly joined the community of interest of the regular employees. Given the Board's emphasis on hours as a proxy for "community of interest," it could reasonably consider it significant that Musgrave only worked one day—the Saturday after the union filed its certification petition—between April 1 and the eligibility date. It could thus conclude that Musgrave was not a new hire for purposes of voting—that his "casual" status effectively continued through the eligibility date—because the most important factor defining his association with the employee community—his schedule—remained sporadic through that date. *See Pat's Blue Ribbons,* 286 N.L.R.B. at 919 n. 6.

The majority points out that the Board "appears never to have used the period between a relevant change of circumstance and the eligibility date as a basis for excluding workers." Maj.Op. at 371 n. 5 (emphasis omitted). This is true, but only because the "relevant change of circumstance" in *Stockham Valve, Beverly Enterprises,* and other "new hire" decisions has always involved an *entirely* new hire, never, as here, the evolution of a "casual" into a "part-time" employee. In these circumstances, the Board could reasonably conclude that it will not consider a continuing "casual" employee eligible to participate in the election, even if he has ostensibly changed jobs, unless a change *in the hours or duties of that employee* demonstrates that the employee has come to share the community of interest enjoyed by regular employees. This is at least one explanation that the Board could articulate on remand which would support its decision to exclude Musgrave's ballot and to which we could defer. By reversing without remanding, the majority precludes the Board from articulating this or other plausible explanations and substitutes the court's own judgment for the Board's expertise in the arena of representation. I think the better route—and one that

best ensures that national labor policies and the certainty of the four-hour rule are advanced—is to remand this case to the Board so that it can better articulate how its eligibility rules apply to the unique circumstances of this case.