SITKA SOUND SEAFOODS,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 98–1624.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 9, 1999.

Decided March 28, 2000.

William T. Grimm argued the cause and filed the briefs for petitioner.

Sharon I. Block, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Linda R. Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Fred L. Cornnell, Jr., Supervisory Attorney. Aileen A. Armstrong, Deputy Associate General Counsel, entered an appearance.

Before: GINSBURG and GARLAND, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The National Labor Relations Board concluded that Sitka Sound Seafoods, Inc. violated §§ 8(a)(1) & (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) & (5), by refusing to bargain with or to provide information to Local 200 of the International Longshoremen and

Warehousemen's Union, AFL–CIO, and ordered the Company to comply with the Act. The Company petitioned for review of the Board's order on the ground that it is not obligated to bargain with the Union because the election in which the employees chose the Union as their exclusive representative is invalid. The Board has cross-applied for enforcement of its order. Because Sitka has not shown that the Board abused its broad discretion in conducting the representation election, we deny the Company's petition and grant the Board's application.

## I. Background

In August 1997 the Union sought to represent the employees at the Company's seafood processing plant in Sitka, Alaska. That facility processes seafood throughout the year, but its busiest time is during the salmon season, that is, July and August. Consequently, the Sitka facility employs varying numbers of production workers during the course of a year. In March 1997, for example, there were only 51 employees, but in August the company employed 186.

The Company places on its "seniority list" those production employees who work at least 1,200 hours during one year. Seasonal production workers, those hired to fill temporary processing demands during the busy periods, do not qualify for the seniority list. Employees on the seniority list work significantly more hours than other production employees (albeit not necessarily full-time year round), receive preferential rehiring rights, and are eligible for health benefits. Although seasonal employees do not have the same preferential rehiring rights as those on the seniority list, any seasonal employee who is laid off (as opposed to fired) is eligible for rehire and the Company tells all such employees they are welcome back during the next busy period. One of the Company's former supervisors testified, however, that on average only about one third of the seasonal employees actually return the following year.

On August 17, 1997, about one week before the Union petitioned for a representation election, the Sitka facility employed 167 production and maintenance workers, of whom 114 were seasonal employees. Of the 114 seasonal employees, 23 had worked in both 1995 and 1996, 14 had worked in either 1995 or 1996, and 77 had not worked for Sitka before. The Union, seeking to exclude all the seasonal employees from the bargaining unit, petitioned for an election in which only the "full-time and regular part-time production and maintenance employees" would vote. The Company, on the other hand, asked the Board to include all seasonal employees in the bargaining unit and to postpone the election until the next seasonal peak in August 1998.

After an extensive hearing in which both the Company and the Union presented evidence, the Regional Director of the Board directed an election to include seasonal employees because he found that seasonal employees performed work similar to that done by employees on the seniority list. In order to limit the franchise to employees with a "substantial and continuing interest in the unit," however, he provided that only those seasonal employees who had worked "at least 120 hours in 1997 and at least 120 hours in either 1996 or 1995" could vote. Seasonal employees who met that test, he reasoned, were sufficiently likely to return to the facility in the future. The Regional Director rejected the Company's request to delay the election until the following August because he found that doing so would unnecessarily deprive permanent employees and those on the seniority list of representation for almost a year. The Board denied the Company's request for review.

Subsequently the Regional Director found that a combination of manual and mail balloting was appropriate. The manual balloting occurred on November 4, 1997 while the mail balloting took place over the course of a month, beginning on that date. Of the 92 eligible voters, 66 cast ballots: 36 were in favor of the Union

and 28 were against the Union; two challenged ballots were not considered in the final tally.

The Company objected to the election on the grounds that it should not have been conducted until the next seasonal peak, the eligibility formula was unreasonable, and mail balloting should not have been allowed. The Regional Director overruled the objections and certified the Union as the representative of the employees, and the Board again refused the Company's request for review.

In June 1998 the Union filed a charge with the Board alleging that the Company had refused to recognize, bargain with, or provide information to it, in violation of §§ 8(a)(1) & (5) of the Act. The Board determined that "[a]ll representation issues ... were or could have been litigated in the prior representation proceeding" and therefore were not subject to further litigation, and that there were no disputes of material fact; the Board therefore granted the General Counsel's motion for summary judgment and ordered the Company to cease and desist from violating the Act. The Company petitioned this court for review of the Board's order and the Board cross-applied for enforcement.

## II. Analysis

The Company maintains that the eligibility formula the Board applied to seasonal workers was unreasonable and inconsistent with Board precedent; the Board abused its discretion by not delaying the election until the Company's next seasonal employment peak; the Board violated its own policy by allowing mail balloting; and the Board should not have disposed summarily of the unfair labor practice charges because there are material facts in dispute.

■ The Board has "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946). The party objecting to a representation election therefore bears a

"heavy burden," *Kwik Care Ltd. v. NLRB,* 82 F.3d 1122, 1126 (D.C.Cir.1996); indeed, we will not overturn the Board's decision as long as it is merely "rational and in accord with past precedent." *B B & L, Inc. v. NLRB,* 52 F.3d 366, 369 (D.C.Cir. 1995). The order under review in this case meets that standard.

### A. Eligibility formula

Ordinarily the Board uses a simple formula to determine who is eligible to vote in a representation election: Employees in the bargaining unit are eligible to vote if they were employed on the date of the election and "during the payroll period ending immediately prior to the Decision and Direction of Election." *Saltwater, Inc.,* 324 NLRB 343, 343 n. 1 (1997); *see American Zoetrope Productions, Inc.,* 207 NLRB 621, 622 (1973). In this case the Board adopted an eligibility formula that excluded some seasonal workers who would have met the standard eligibility test. The Company raises four challenges to the special eligibility formula the Board used in this case: it conflicts with Board precedent because (1) it disenfranchises workers who would have been eligible under the standard test, and (2) the Board does not ordinarily apply an eligibility formula to "seasonal" workers; and it is unreasonable because (3) it disenfranchises employees with a continuing interest in the unit, and (4) it conflicts with the Regional Director's own description of the standard for voter eligibility as set forth in his Decision and Direction of Election and in the Notice of Election.

■ As we have noted previously, the Board uses an eligibility formula in order to limit the franchise to those employees who work with "sufficient continuity and regularity ... to establish [a] community of interest with other unit employees." *B B & L, Inc.,* 52 F.3d at 370; *see also Trump Taj Mahal Associates,* 306 NLRB 294, 295 (1992) *enforced,* 2 F.3d 35 (3d Cir.1993). Because each employment situation is different, the Board has an "obli-

gation to tailor [its] general eligibility formulas to the particular facts of the case," *B B & L, Inc.,* 52 F.3d at 370 (quoting *American Zoetrope,* 207 NLRB at 623); "no single eligibility formula must be used in all cases." *Saratoga County Chapter NYSARC, Inc.,* 314 NLRB 609, 609 (1994). Determining which employees share a community of interest sufficient to entitle them to vote in a representation election entails, therefore, an inquiry with multiple facets. For example, the Board has stated that when assessing the "expectation of future employment among seasonal employees" it considers:

> the size of the area labor force, the stability of the Employer's labor requirements and the extent to which it is dependent upon seasonal labor, the actual reemployment season-to-season of the worker complement, and the Employer's recall or preference policy regarding seasonal employees.

*Maine Apple Growers, Inc.,* 254 NLRB 501, 502–03 (1981). In this case the Regional Director adopted a special eligibility formula specifically in order to limit the franchise to seasonal employees with "a substantial and continuing interest in the unit."

■ 1. The Company's first challenge to the eligibility formula used in this case is that the Board has never before used a special formula when the effect would have been to disenfranchise workers eligible to vote under the standard test. Although it is true that the Board usually adopts a special eligibility formula in order to extend the franchise to employees who would not otherwise be eligible to vote, *see, e.g., Steiny & Co.,* 308 NLRB 1323, 1324–27 (1992) (and cases cited therein), it is not true that the Board has never used such a formula to narrow the franchise.

In *American Zoetrope,* for example, the union sought to represent a bargaining unit composed of "all editorial employees, including film editors, sound editors, assistant editors, and negative cutters" employed by a film company. 207 NLRB at 622. Employees in the unit worked only

sporadically; they were "hired for a particular production, sometimes only for a day's work," and then recalled when and if future work became available. *Id.* The union asked the Board to determine eligibility to vote using the standard test, but the Board declined. Finding that a history of reemployment was the only credible evidence that any particular employee had a reasonable expectation of future employment—and hence a continuing interest in the bargaining unit—the Board limited the franchise to employees who were "employed by the Employer on at least two productions during the year preceding [the Board's decision]" and were not terminated or voluntarily released prior to "completion of the last job for which they were employed." *Id.* at 623; *see also Medion, Inc.,* 200 NLRB No. 145 (1972) (adopting a similar formula). Obviously, an employee who met the standard eligibility test of employment on the day of the election and during the preceding payroll period might not have passed the special test used in *American Zoetrope* because it required work on at least two productions in the preceding year. Therefore, the special eligibility formula the Board used in this case is not a break with precedent, and cannot be faulted on the basis of an argument that proceeds from the contrary premise. *See NLRB v. Western Temporary Services, Inc.,* 821 F.2d 1258, 1262 (7th Cir.1987) (upholding eligibility formula allowing part-time employees to vote only if "worked at least an average of four hours per week during the six months immediately preceding the election eligibility date"); *DIC Entertainment, LP,* 328 NLRB No. 86 (1999) (allowing part-time employees in entertainment industry to vote if worked on two productions for total of five days in year prior to direction of election or for total of 15 days in year prior to direction of election); *Steiny & Co.,* 308 NLRB at 1325 (citing *American Zoetrope* with approval as example of valid eligibility formula); *Artcraft Displays, Inc.,* 263 NLRB 804 (1982) (seasonal part-time employees eligible to vote if worked

minimum of 15 hours during quarter spanning seasonal peak or had accumulated 1,000 "seniority hours," were working or available to work and were on seniority list).

2. The Company next argues that while the Board may have applied a special eligibility formula in "short term, sporadic and intermittent employment situations," the Board has not (except in "rare instances," which the Company attempts to distinguish), applied such a formula to "seasonal" workers, by which the Company means "full-time regular employees who are utilized during clearly defined periods of peak operations that recur the same time(s) from year-to-year." Assuming the Company does not, in fact, employ its seasonal workers on a short term, sporadic, or intermittent basis, however, its legal argument fails because, as the Regional Director noted, the Board has indeed applied special eligibility formulae to regularly employed "seasonal" workers before; therefore its adoption of the formula in this case does not conflict with Board precedent.

Consider, for example, *Daniel Ornamental Iron Co.*, 195 NLRB 334 (1972). Whenever the employer there could not meet customers' demands using its regular staff, it hired part-time workers from a pool of 27 who regularly performed such work for the employer. *See id.* Having included the part-time workers in the bargaining unit, the Board eschewed the standard eligibility test and limited the vote among the part-time employees to those who had "worked a minimum of 15 days in either of the two 3–month periods immediately preceding the date of issuance of the direction of election." *Id.* at 334–35. The Board explained:

> The Employer's principal customers are in the housing and construction industries, and because of the seasonality of those industries business usually experiences a slack period in the fall of the year, beginning in September or October, during which period [the Employer's] need for the part-time welders drops sharply. In cases involving year-round operations with fluctuating need for extra or on-call employees, the Board has found it equitable to include in the unit ... all extra or part-time employees [who meet the eligibility formula quoted above]....

*Id.* at 334. Like the employer in *Daniel Ornamental*, Sitka employs a core group of workers year round and hires extra production employees for the seasonal peaks. However the Company may wish to characterize its "seasonal" employees, it has not distinguished them from those in *Daniel Ornamental*. *See also Trump Taj Mahal Associates*, 306 NLRB at 295 (applying eligibility formula to temporary employees whom employer "regularly called" and who had "averaged a substantial number of work hours since the opening" of employer's facility); *Artcraft Displays, Inc.*, 263 NLRB at 804 (applying eligibility formula to regularly employed seasonal workers). Accordingly, we reject its second challenge to the eligibility formula.

3. The Company next argues that the special eligibility formula is unreasonable because it disenfranchises employees who have a "reasonable expectancy of recall." In fact, the Regional Director found that of the 114 seasonal employees listed on the Company's employment roster as of August 17, 1997, only 37 had worked in either of the two previous years. Of those 37, all but five were eligible to vote under the formula the Board used in this case. Based upon these facts, the Regional Director concluded that the eligibility formula would accurately enough limit the franchise to seasonal employees who had demonstrated a continuing interest in the unit. In light of this evidence, we cannot say that the Board abused its discretion by adopting the eligibility formula in this case.

4. Finally, the Company argues that the eligibility formula is unreasonable because it conflicts with the Regional Director's description of the voter eligibility criterion in his own Decision and in the Notice of Election. As the Company pur-

ports to read them, the Decision and Notice granted the franchise to all production employees, including both seasonal employees who were employed on the date of the election and during the previous payroll period—as provided by the standard criterion—and seasonal employees who met the special eligibility formula crafted for this case.

In its opening brief before this court the Company merely refers to this argument; only in its reply brief does it actually argue the point. As a result the Board, in its brief, understandably does not respond to the argument. In order to prevent "this sort of sandbagging of appellees and respondents, we have generally held that issues not raised until the reply brief are waived." *Board of Regents of University of Washington v. EPA*, 86 F.3d 1214, 1221 (1996) (citations omitted). So we hold again.*

B. Timing of the election

■ The Regional Director ordered that the representation election be held in November 1997, rejecting the Company's request that it be delayed until the next seasonal peak in August 1998. The Company contends that failure to delay the election was an unexplained break with the Board's past practice. We reject the Company's challenge because holding the election prior to the seasonal peak was both reasonable and fully consistent with the Board's precedent.

As the Regional Director noted, the Board has in the past "declined to postpone elections in facilities having seasonal peaks where production operations continue throughout the year." For example, in *Baugh Chemical Co.*, 150 NLRB 1034 (1965), the employer had 40 year-round

employees and, during its seasonal peak, hired 40 additional employees. *See id.* at 1035. The Regional Director had ordered that the election be delayed about nine months until the next seasonal peak, but the Board reversed:

> Unlike the seasonal industry cases where production operations are carried on only during a certain portion of the year, on a seasonal basis, here the Employer is engaged virtually in year-round production operations. Further, the number of employees in the Employer's year-round complement is substantial compared to the number in the complement employed during peak operations. In circumstances such as these a postponement of the election until a seasonal peak would in our opinion, unduly hamper year-round employees in the enjoyment of their rights under the Act. We believe, therefore, that it will best effectuate the purposes of the Act to direct an immediate election herein.

*Id.* at 1035–36. As in *Baugh Chemical Co.*, the employer's facility in this case operates throughout the year with a substantial number of permanent production employees. Although the ratio of seasonal to permanent employees is of course greater at the seasonal peak, the number of employees who work throughout the year at the Sitka facility is significant. Therefore, the Board's determination that the purposes of the Act would best be effectuated if the permanent employees at the Sitka facility were allowed to vote for or against representation without significant delay was neither an abuse of discretion nor inconsistent with past practice.

---

* Solely for the benefit of the curious reader, we note that the Regional Director rejected this argument as follows:

> It is obvious that employees who were not on the seniority list, and who did not meet the [eligibility formula], were *not* eligible. To do [sic] otherwise, would be to permit new hires with very few hours who just happen to be working on the eligibility/elec-

tion dates, to vote, while denying that right to laid-off employees who worked a similar number of hours, but who happen *not* to be working on the eligibility/election dates. That, of course, would defeat the very purpose of the eligibility formula, i.e., to distinguish those individuals with substantial continuing work ties to the Employer from those with only a minimal, casual interest.

## C. Mixed manual-mail balloting

According to § 11336.1 of the Board's Casehandling Manual, in a " 'mixed' manual-mail election" ballots should not be mailed to "those [employees] on layoff status unless all parties agree." The Company argues that the Board abused its discretion by mailing ballots, over the Company's objection, to seasonal employees who were not employed on the date of the election.

We note first that the Casehandling Manual does not bind the Board; it is intended merely to provide guidance to the Board's staff. *See Kwik Care Ltd.,* 82 F.3d at 1126. Therefore, the relevant question is whether, quite apart from the Manual, the Board acted unreasonably. The answer is obvious: Having decided to include in the representation election seasonal employees who were eligible under the special formula validly adopted in this case, the Board reasonably determined that mail was the only effective way to reach employees who were not in the Sitka area when the election was held, about three months after the peak season. Had the Board upheld the Company's objection to the mail ballots then it would have denied 41 otherwise eligible seasonal employees the chance to vote. The Board's use of the mixed balloting system was a reasonable attempt to avoid the predictably substantial disenfranchisement that would otherwise have occurred. We therefore reject the Company's challenge on this issue.

## D. Summary judgment

Finally, the Company objects to the Board's summary disposition of the unfair labor practice charges against it. The Company contends that it raised substantial factual issues that demanded resolution at a post-election hearing and that the Board's failure to conduct such a hearing conflicts with our decision in *Garlock Equipment Co. v. NLRB,* 709 F.2d 722 (1983), and with *Linn Gear Co. v. NLRB,* 608 F.2d 791 (9th Cir.1979). We reject the challenge because the Company did not present evidence meriting a hearing and the grant of summary judgment does not conflict with either *Garlock* or *Linn Gear.*

The Supreme Court established long ago that the Board need not afford a party objecting to a representation hearing more than one opportunity to litigate any particular issue. *See Pittsburgh Plate Glass Co. v. NLRB,* 313 U.S. 146, 162, 61 S.Ct. 908, 85 L.Ed. 1251 (1941). More specifically, we have held:

[I]n the absence of newly discovered evidence or other special circumstances requiring reexamination of the decision in the representation proceeding, a respondent is not entitled to relitigate in a subsequent refusal-to-bargain proceeding representation issues that were or could have been litigated in the prior representation proceeding.

*Thomas-Davis Medical Centers, P.C. v. NLRB,* 157 F.3d 909, 912 (1998). The party objecting to the representation election bears the burden of producing "specific evidence which prima facie would warrant setting aside the election, for it is not up to the Board staff to seek out [such] evidence." *Amalgamated Clothing Workers of America v. NLRB,* 424 F.2d 818, 828 (D.C.Cir.1970). This burden cannot be met by "[n]ebulous and declaratory assertions"; only "specific evidence of specific events from or about specific people" will do. *Id.; see North of Market Senior Services, Inc. v. NLRB,* 204 F.3d 1163, 1167 (D.C.Cir.2000) (evidence "must point to specific events and specific people").

In this case, the Company participated in an extensive hearing, at which both it and the Union presented documentary evidence and testimony, prior to the representation election. The Company claims, however, that it raised "substantial issues of fact" after the election. Exactly what those factual issues are, however, the Company does not make clear. Nowhere in the brief it submitted to the Board in opposition to the General Counsel's motion for summary judgment did the Company discuss any new factual evidence. In its opening brief before this court, the Com-

pany devotes all of two sentences to its supposedly new factual evidence—and they are wholly conclusory. In its reply brief the Company repeats the assertion that its "objections [to the representation election] raised substantial issues of fact," and gives as examples "whether a representative complement of employees was working during the election period, and whether the mechanics of the election unfairly deprived even those employees who were found eligible a reasonable opportunity to vote." These are not issues of fact, of course: representativeness, like reasonableness, is a legal standard. Nor did the Company present "specific evidence" of any factual dispute underlying the application of those standards; therefore it is not entitled to another hearing.

The reader will hardly be surprised if *Garlock* and *Linn Gear* are not contrary to so obvious a conclusion. In *Garlock,* the Board amended a union's certification to reflect a "formal affiliation" between that union and another. *See Garlock,* 709 F.2d at 723. Although the Board could not properly make such an amendment without finding that "as a factual matter ... [the] affiliation did not result in a fundamental change in the bargaining representative," *id.,* the Board had granted the amendment "based solely upon findings in an *ex parte* administrative investigation." *Id.* We held that "[i]f the Board holds no hearing in amending a certification, it may not summarily dispose of a ... representation question in subsequent unfair labor practice proceedings where the employer raises substantial factual issues material thereto." *Id.*

*Linn Gear,* in turn, involved a disputed ballot cast in a representation election by an employee who was also the son of the employer. Without holding a hearing, the Regional Director concluded that the employee did not "share a community of interest" with the others in the bargaining unit and was therefore ineligible to vote. *Linn Gear,* 608 F.2d at 792–93. The Board summarily affirmed, but the Ninth Circuit reversed the Board, holding that the company was entitled to a hearing to resolve the disputed facts relevant to whether the employee had a community of interest with those in the bargaining unit. *Id.*

Both *Garlock and Linn Gear* differ from the case at bar in two critical respects. First, in neither of those cases did the Board hold even one hearing; here the Board held a hearing prior to the representation election at which it afforded the Company an opportunity to present any objections it had as of that time. Second, in both *Garlock* and *Linn Gear* the party objecting to summary judgment had proffered to the Board specific evidence putting material facts in dispute; here the Company has not presented any evidence of a "substantial factual issue" that arose since the pre-election hearing. Because neither *Linn Gear* nor *Garlock* is comparable to this case, we reject the Company's challenge to the grant of summary judgment.

### III. Conclusion

For the foregoing reasons, we deny the Company's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*