United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 17, 2000 Decided July 11, 2000 

 No. 99-1513

 AMSC Subsidiary Corporation, 
 Appellant

 v.

 Federal Communications Commission, 
 Appellee

 Globalstar, L.P., et al., 
 Intervenors

 Appeal of an Order and Authorization of the 
 Federal Communications Commission

 Bruce D. Jacobs argued the cause for appellant. With him 
on the briefs were Barry H. Gottfried, Lon C. Levin and 
Hadrian R. Katz.

 Philip L. Malet, William D. Wallace and William F. Adler 
were on the briefs for intervenors supporting appellant.

 Gregory M. Christopher, Counsel, Federal Communications 
Commission, argued the cause for appellee. With him on the 
brief were Christopher J. Wright, General Counsel, and Dan-
iel M. Armstrong, Associate General Counsel.

 Gregory C. Staple and R. Edward Price were on the brief 
for intervenors supporting appellee.

 Before: Ginsburg, Randolph, and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: AMSC Subsidiary Corporation 
petitions for review of the Federal Communications Commis-
sion's decision to license mobile earth terminals (METs) to 
receive Mobile Satellite Service (MSS) from a foreign-licensed 
satellite in the Upper L-band of the electromagnetic spec-
trum. See In re Applications of SatCom, Order & Authoriza-
tion, 14 F.C.C.R. 20,798, 20,798 p 1 (1999). AMSC claims the 
Commission effectively modified its license to provide MSS in 
the Upper L-band without affording it the hearing required 
by s 316 of the Communications Act of 1934. AMSC also 
claims the Commission's decision was arbitrary and capricious 
because it abandoned without explanation the agency's long-
standing policy against authorizing more than one MSS sys-
tem to operate in the Upper L-band. In addition, two 
intervenors claim the Commission could not lawfully allow 
METs in the United States to use a satellite that is not itself 
licensed by the Commission to serve the United States. 
Finding no merit in AMSC's claims, and not reaching that of 
the intervenors, we deny the petition for review.

 I. Background

 MSS is a realtime voice and data telecommunications ser-
vice provided to and from METs located anywhere within the 
transmission area of the satellite. MSS can be used on land, 
including areas too sparsely settled to support cellular or 
other land-based telecommunications services, at sea, or in 
the air. In a typical MSS system, a MET transmits to the 
satellite on one frequency and the satellite simultaneously 
transmits back to the MET on another frequency. The 

satellite also communicates with a fixed earth terminal that is 
connected to the public switched telephone network, thereby 
allowing direct communications between a MET and an ordi-
nary telephone.

 The technical characteristics of MSS create a unique inter-
ference problem. A MET uses a nearly omnidirectional 
antenna to communicate with an MSS satellite, and is incapa-
ble of discriminating among transmissions from different 
MSS satellites; likewise, an MSS satellite transmits indis-
criminately to a large geographic area. Therefore, if satel-
lites or METs in two MSS systems covering the same geo-
graphic area transmit on the same frequency, then their 
signals will interfere with one another and one or both signals 
will not be useful. This can occur even if the two METs are 
thousands of miles apart. Because of this problem, no two 
MSS systems can operate on the same frequencies insofar as 
the footprints of their satellites overlap.

 A. AMSC's License
 
 In 1985 the Commission proposed to license an MSS sys-
tem to serve the United States in the 28 MHz that comprise 
the Upper L-band. After receiving comments on its propos-
al, the Commission estimated that the minimum spectrum 
needed for a viable MSS system was 20 MHz; considering 
that estimate, the limited amount of spectrum available, and 
the high cost of building an MSS system, the Commission 
decided to license only one system. See In re Amendment of 
Parts 2, 22 and 25 of the Commission's Rules, Second Report 
& Order, 2 F.C.C.R. 485, 486 p 6 (1987) (Upper L-band 
Licensing Order). The Commission therefore ordered the 
license applicants to form a consortium for the purpose of 
developing a single MSS system; in 1989 the Commission 
licensed that consortium, AMSC, to provide MSS in the 
United States using the entire Upper L-band. See In re 
Amendment of Parts 2, 22 and 25 of the Commission's Rules, 
Memorandum Opinion, Order & Authorization, 4 F.C.C.R. 
6041, 6058 p 121 (1989) (AMSC Licensing Order).

 In addition to AMSC's, there are four MSS satellites 
transmitting to all or parts of North America in the Upper L-

band: TMI (licensed by Canada), Telecomm (licensed by 
Mexico), TMSat (licensed by Russia), and Inmarsat (licensed 
by the United Kingdom). If AMSC transmitted on all the 
frequencies in the Upper L-band, its signals would interfere 
with those of the other MSS operators. Therefore, although 
it licensed AMSC to use the entire Upper L-band, the 
Commission expressly conditioned AMSC's use of the license 
upon the outcome of "international coordination," id. at 6048 
p 52, that is, the multilateral negotiating process used to avoid 
interference among carriers licensed by different nations to 
operate in the same band of spectrum. Thus, in the jargon of 
the trade, AMSC is authorized to operate only in those 
portions of the Upper L-band that are "coordinated for" its 
use. Order & Authorization, 14 F.C.C.R. at 20805 p 14.

 B. International Coordination
 
 The Commission, representing the United States in negoti-
ations with the other four affected nations, sought to coordi-
nate 20 MHz of spectrum in the Upper L-band for the 
exclusive use of AMSC. Because the combined spectrum 
demands of the five different licensees far exceeded the 
amount of spectrum available, the five nations were unable to 
reach a permanent coordination agreement and the Commis-
sion was unable to secure 20 of the 28 MHz for AMSC. In 
1996, however, the five nations did enter into an interim 
agreement (known as the Mexico City Memorandum of Un-
derstanding (MOU)) under which, pending a permanent coor-
dination agreement, the Upper L-band would be coordinated 
on a yearly basis by agreement among the five MSS opera-
tors themselves. See Order & Authorization, 14 F.C.C.R. at 
20802 p 18.

 Under the Mexico City MOU, the amount of spectrum 
coordinated for each MSS system can change from year to 
year. See id. The key variables guiding negotiations among 
the five operators are their (1) present spectrum usage and 
(2) projected near-term needs. The five operators were able 
to reach agreements for 1997, 1998, and 1999 but not for 2000. 
See id. at 20814 p 34.

 C. DISCO II
 
 As mentioned above, the Commission determined in the 
Upper L-band Licensing Order that it would license only one 
MSS system in the Upper L-band. The adoption by the 
United States in 1997 of the WTO Agreement on Basic 
Telecommunications Services, however, obligated the United 
States to open its satellite markets to foreign systems li-
censed by other WTO member countries. See Fourth Proto-
col to the General Agreement on Trade in Services (GATS) 
(April 30, 1996), 36 I.L.M. 336 (1997) (entered into force Jan. 
1, 1998). The Commission therefore adopted procedures to 
give satellite systems licensed by other countries access to 
the U.S. market. See In re Amendment of the Commission's 
Regulatory Policies to Allow Non-U.S. Licensed Space Sta-
tions to Provide Domestic and International Satellite Service 
in the United States, Report & Order, 12 F.C.C.R. 24,094 
(1997) (DISCO II).

 In addition to allowing a satellite operator licensed by a 
foreign country to apply for a U.S. license in the same way 
that a would-be domestic operator applies for a license to 
serve customers in the United States, that is, through a 
"space station processing round," the Commission established 
a second mechanism by which a foreign system could get 
access to the U.S. market: Earth stations located in the 
United States could apply for a license to receive service from 
a satellite licensed by another country even if that satellite 
was not itself licensed to serve the United States. See id. at 
24173-74 p p 183-88. The Commission announced it would 
grant these earth station licenses if doing so was in the public 
interest, see id. p 186, taking into account "competition in the 
United States[,] ... spectrum availability, eligibility ... and 
operating requirements, and national security, law enforce-
ment, foreign policy, and trade issues," id. at 24106 p 29.

 Concerning spectrum availability--the one factor in the 
DISCO II public interest analysis that is relevant to this 
case--the Commission acknowledged that the WTO agree-
ment did not require it to authorize a satellite licensed by a 
foreign country to serve customers in the United States if 

there was inadequate spectrum: "[The Commission does] not 
expect to require existing U.S. satellite systems to change 
their licensed operating parameters or to decrease their 
capacity in order to accommodate additional non-U.S. sys-
tems." Id. at 24158 p 147. If the foreign satellite operator 
sought access to the U.S. market by applying for earth 
station licenses for U.S. customers to use its satellite, then 
the Commission indicated that in assessing spectrum avail-
ability as part of the public interest analysis it would:

 determine whether, and to what extent, the proposed 
 U.S. service will impact existing operations in the United 
 States.... [In] exceptional cases where grant would 
 create debilitating interference problems or where the 
 only technical solution would require U.S.-licensed sys-
 tems to significantly alter their operations[,] we would 
 impose technical constraints on the foreign system's op-
 erations in the United States or, in cases where any such 
 measures would be insufficient to remedy the technical 
 problem, deny the request.
 
Id. at 24159 p 150. AMSC did not petition for review of 
DISCO II.

 D. The Order & Authorization
 
 Shortly after DISCO II was released, SatCom Systems, 
Inc., a U.S. company, and TMI Communications, the company 
that operates the MSS satellite system licensed by Canada, 
each applied to the Commission for earth station licenses that 
would allow up to 125,000 new METs in the United States to 
use the TMI satellite for MSS in the Upper L-band. See 
Order & Authorization, 14 F.C.C.R. at 20799 p p 2-3. The 
Commission reviewed the license applications under the pub-
lic interest analysis announced in DISCO II. On the issue of 
spectrum availability, the Commission concluded that the new 
METs would have no effect upon AMSC's existing operations. 
See id. at 20810 p 25. Although the METs would be licensed 
to receive MSS from the TMI satellite throughout the Upper 
L-band, their licenses would be conditioned upon receiving 
service only in those portions of the Upper L-band coordinat-

ed for the use of the TMI satellite, see id. at 20826 p p 63-64, 
and not on spectrum coordinated for AMSC.

 This license condition comes into play, however, only when 
there is a coordination agreement in effect. See id. As AMSC 
pointed out to the Commission, the existing coordination 
agreement was set to expire on December 31, 1999--less than 
two months after the Commission adopted the Order & 
Authorization. If no new coordination agreement was 
reached, AMSC argued, then the new METs would be free to 
operate anywhere in the Upper L-band, potentially interfer-
ing with AMSC's licensed MSS operations.

 The Commission responded to this concern by further 
conditioning the new earth station licenses upon noninterfer-
ence with AMSC (and all other MSS operations):

 In the absence of any continuing operator-to-operator 
 agreement in the L-band, SatCom and TMI's opera-
 tions[,] like those of AMSC ... will be on a non-
 interference basis until a future operator-to-operator 
 agreement is reached.
 
Id. at 20814 p p 33-34; see also id. at 20826 p p 63-64. Find-
ing that the requested earth station licenses satisfied this and 
the other public interest requirements laid out in DISCO II, 
the Commission granted earth station licenses to SatCom and 
TMI.

 II. Analysis

 AMSC petitions this court for review of the Order & 
Authorization, raising two challenges: (1) the Commission in 
effect modified AMSC's license without affording it the hear-
ing required by s 316 of the Communications Act; and (2) 
the Commission, without giving a reasoned explanation, re-
versed its longstanding policy of having only one MSS licen-
see in the Upper L-band. The Intervenors raise a different 
claim: The Commission could not allow METs in the United 
States to use a satellite that is not licensed by the Commis-
sion to serve the United States.

 A. Modification of AMSC's License

 In s 316 of the Communications Act the Commission is 
expressly authorized to modify a license as follows:

 Any station license or construction permit may be modi-
 fied by the Commission ... if in the judgment of the 
 Commission such action will promote the public interest, 
 convenience, and necessity, or the provisions of this 
 chapter or of any treaty ratified by the United States will 
 be more fully complied with.
 
47 U.S.C. s 316(a)(1). AMSC claims that in the Order & 
Authorization the Commission modified AMSC's license to 
provide MSS throughout the Upper L-band without providing 
the hearing required by s 316. The Commission does not 
dispute that s 316 requires a hearing if the Commission 
modifies a license, but contends that it did not modify 
AMSC's license and therefore did not have to hold a hearing.

 Although the Commission did not, of course, literally 
change the terms of AMSC's license, we regard "a license [as] 
modified for purposes of section 316 when an unconditional 
right conferred by the license is substantially affected." 
P&R Temmer v. FCC, 743 F.2d 918, 927-28 (D.C. Cir. 1984). 
AMSC claims the Commission substantially affected rights 
conferred by its license in two respects.

 First, AMSC argues that the Commission has "harm[ed] 
AMSC's ... prospects" for coordinating sufficient spectrum 
to meet its needs in future rounds of international negotia-
tions. By licensing METs in the United States to use the 
TMI satellite, the Commission increased TMI's present and 
future needs in the Upper L-band, thereby reducing AMSC's 
need as a proportion of aggregate international demand for 
that spectrum. Because the crucial variables affecting coor-
dination under the Mexico City MOU are present spectrum 
usage and projections of short-term future spectrum need, 
AMSC claims the Commission "dramatically improve[d] 
TMI's negotiating position and correspondingly weaken[ed] 
AMSC's negotiating position," thus ensuring that AMSC will 
be unable to obtain through the international coordination 
process the 20 MHz it says it needs.

 The Commission responds that AMSC's license has always 
been expressly conditioned upon the international coordina-
tion process. AMSC's license does not guarantee success in 
those negotiations; it merely provides the opportunity to 
participate, which is unaffected by the Order & Authoriza-
tion.

 We agree with the Commission. We assume for the sake 
of the argument that AMSC is correct in predicting that TMI 
will obtain more L-band spectrum at AMSC's expense in 
future rounds of international coordination. That does not 
work a modification of AMSC's license because the license 
contains no "unconditional right" to any particular outcome in 
the coordination process. P&R Temmer, 743 F.2d at 927. 
On the contrary, the license is expressly conditioned upon and 
thereby made subordinate to the outcome of international 
coordination. We further note that AMSC is not required to 
accept any future coordination agreement; it can simply veto 
an agreement it believes offers it an unduly limited amount of 
spectrum, whether as a result of TMI's greater traffic in the 
United States or for any other reason.

 Second, AMSC claims the Commission modified its license 
by subjecting it to an increased risk of electrical interference. 
See FCC v. National Broadcasting Co. (KOA), 319 U.S. 239, 
245 (1943); Western Broadcasting Co. v. FCC, 674 F.2d 44, 50 
(D.C. Cir. 1982). The Commission acknowledged in the Or-
der & Authorization that the AMSC and TMI satellites cover 
the same geographic area and so would cause mutually de-
structive interference to the extent they operate on the same 
frequencies. 14 F.C.C.R. at 20815 p 36. Therefore, AMSC 
argues, the Commission's licensing of new METs to use the 
TMI satellite increases the likelihood that AMSC will face 
interference in conducting its operations.

 Because the new METs are limited to the spectrum coordi-
nated for use by TMI, however, the Commission denies that 
the Order & Authorization increases the likelihood that 
AMSC will face interference. The Commission's point is 
plainly well-taken when an international coordination agree-
ment is in effect: With each system licensed to use only the 

Upper L-band frequencies that have been coordinated for its 
use, AMSC and TMI will not interfere with each other.

 AMSC claims, however, that when there is no coordination 
agreement in effect SatCom and TMI are free to operate on 
any frequency in the Upper L-band, including the frequencies 
that had previously been coordinated for AMSC. The Com-
mission responds that even then the likelihood of interference 
is not increased by the Order & Authorization because 
SatCom's and TMI's licenses are expressly conditioned upon 
their operating "on a non-interference basis." Id. at 20826 
p p 63-64. If they violate that express condition, then the 
Commission may revoke their licenses. See 47 U.S.C. s 312. 
(We note, without surprise, that AMSC does not claim to have 
experienced any interference since December 31, 1999, when 
the last coordination agreement expired.)

 In sum, we agree with the Commission that in these 
circumstances AMSC's claim of an increased likelihood of 
interference is too speculative to constitute a modification of 
its license cognizable under s 316. Therefore, no hearing 
was required.

 B. Reasoned Decision Making
 
 AMSC claims the Commission failed adequately to explain 
in the Order & Authorization the reversal of its long-held 
position that the amount of spectrum needed for a viable MSS 
system precludes the Commission from licensing more than 
one such system in the Upper L-band. AMSC is correct that 
the Commission's policy had been to authorize only one MSS 
system in the Upper L-band; AMSC's claim fails, however, 
because the Commission reversed that policy in DISCO II, 
and replaced it with a public interest condition that the 
Commission then applied--with an adequate explanation--in 
the Order & Authorization here under review.

 The Commission points out in the Order & Authorization 
that it had established rules in DISCO II for licensing earth 
stations to receive service from a satellite licensed by another 
country if such service would be in the public interest. 14 
F.C.C.R. at 20804 p 11. AMSC had expressed its concern in 

DISCO II that there was inadequate spectrum in the Upper 
L-band to allow a non-U.S. satellite to serve MSS customers 
in the United States. See Reply Comments of AMSC Subsid-
iary Corp., IB Docket No. 96-111 (Sept. 5 1997). Although it 
was aware of AMSC's concern, the Commission did not treat 
the satellite market in the Upper L-band differently than any 
other U.S. satellite market. By its terms, therefore, the 
public interest analysis in DISCO II appears to govern entry 
by foreign-licensed satellites into the Upper L-band MSS 
market in the United States.

 AMSC argues, however, that the public interest analysis in 
DISCO II did not alter the Commission's existing spectrum 
management policy for the Upper L-band; to the contrary, 
AMSC claims DISCO II incorporated that policy as one 
requirement that a non-U.S. licensed satellite must satisfy in 
order to use the Upper L-band to serve customers in the 
United States. In other words, AMSC reads DISCO II as 
merely contingent: If at some future point AMSC were to 
obtain 20 MHz of spectrum (or if the Commission were to 
give a reasoned explanation why AMSC should make do with 
less than 20 Mhz) then the Commission could authorize a 
foreign MSS to serve the United States in the Upper L-band 
pursuant to the DISCO II procedures. Because AMSC has 
less than 20 MHz of spectrum, however, and the Commission 
has not explained why AMSC has enough spectrum to be 
viable--indeed, it expressly reserved the issue how much 
spectrum is required for an MSS to be viable, see Order & 
Authorization, 14 F.C.C.R. at 20813 p 31 & n.85--AMSC 
claims the Commission failed to provide a reasoned explana-
tion for allowing a second MSS system to serve the United 
States in the Upper L-band.

 The Commission denies that the public interest analysis in 
DISCO II carried forward the Commission's prior spectrum 
management policy for the Upper L-band. The policy prior 
to DISCO II had been concerned with AMSC's eventual 
spectrum needs; the Commission's goal had been to secure 
for AMSC use of at least 20 MHz in the Upper L-band. The 
factor of spectrum availability in the public interest analysis 
of DISCO II, however, protects only AMSC's existing opera-

tions. See DISCO II, 12 F.C.C.R. at 24158-59 p p 147, 150 
(Commission "d[oes] not expect to require existing U.S. satel-
lite systems to change their licensed operating parameters or 
to decrease their capacity in order to accommodate additional 
non-U.S. systems," and Commission will condition or decline 
license applications "where grant would create debilitating 
interference problems or where the only technical solution 
would require U.S.-licensed systems to significantly alter 
their operations").

 We agree with the Commission that in the DISCO II 
rulemaking proceeding it changed the spectrum management 
policy for the Upper L-band; we think the matter is clear 
but, even were it opaque, we would accept the Commission's 
reasonable interpretation of its own rules. See Cassell v. 
FCC, 154 F.3d 478, 484 (D.C. Cir. 1998). The only open 
question, therefore, is whether the Commission applied DIS-
CO II in an arbitrary and capricious manner in the present 
case. The Commission explained at length in the Order & 
Authorization why SatCom's and TMI's licenses satisfy the 
tests for spectrum availability announced in DISCO II: The 
new METs will not require AMSC to change its licensed 
operating parameters, see 14 F.C.C.R. at 20810 p 25, nor to 
decrease its system capacity, see id. at 20811 p 26; neither 
will they cause interference problems for AMSC, see id. 
p p 27, 33-34. Because the Commission thus gave a thorough 
and reasoned explanation of its decision, we deny AMSC's 
petition for review.*

 C. The Intervenors' Claim

 Intervenors Globalstar L.P. and Space System License, 
Inc. claim the Commission cannot license METs in the United 

__________
 * AMSC claims in its reply brief that the Commission failed to 
address AMSC's objection to SatCom's and TMI's failure to provide 
certain technical information required by Commission regulations. 
Although AMSC alluded to the factual basis for this claim in the 
statement of facts in its opening brief, it did not actually make the 
argument until its reply brief. The argument is therefore waived. 
See Sitka Sound Seafoods, Inc. v. NLRB, 206 F.3d 1175, 1181 (D.C. 
Cir. 2000).

States to use the TMI satellite without that satellite having 
first been licensed to operate in the United States--a require-
ment that would have obliged the Commission to conduct a 
space station processing round in which the intervenors could 
also have competed for a license. The Commission urges us 
not to consider the intervenors' claim because the petitioner 
did not raise it and there are no exceptional circumstances 
warranting its consideration at the instance of an intervenor. 
The intervenors reply that they do not raise an issue different 
from that raised by AMSC; rather, as required by D.C. Cir. 
Rule 28(e), they merely "focus upon points not made or 
adequately elaborated upon in [AMSC's] brief, although rele-
vant to the issues" raised by AMSC. Specifically, the com-
mon issue as they state it is "whether the FCC unlawfully 
granted [the TMI satellite] access to MSS spectrum in the 
United States that was not otherwise available for licensing 
except to AMSC."

 Recall that AMSC claimed the Commission was required to 
explain why AMSC could make do with less than 20 MHz 
before it allowed another satellite to serve customers in the 
United States using the Upper L-band; it did not deny that 
with such an explanation the Commission could allow the 
second satellite to provide such service using the licensing 
procedure for earth stations it announced in DISCO II. 
Ratcheting down the intervenors' issue to a comparable level 
of abstraction, one can see that the intervenors are indeed 
trying to raise a different issue than does the petitioner. The 
intervenors argue that even if the Commission fully explained 
why there is sufficient spectrum in the Upper L-band for two 
MSS systems to serve U.S. customers, it still could not allow 
TMI to serve customers in the United States without con-
ducting a space station processing round.

 We have repeatedly held that only in "extraordinary cases," 
Lamprecht v. FCC, 958 F.2d 382, 389 (D.C. Cir. 1992), will we 
address an issue raised solely by an intervenor. We have 
identified two factors, at least one (and perhaps both) of 
which must be present to establish such circumstances: The 
intervenor had no incentive to file its own petition for review; 
and resolution of the issue raised by the intervenor is an 

"essential predicate" to the resolution of the issue raised by 
the petitioner. Synovus Fin. Corp. v. Board of Governors of 
the Fed. Reserve Sys., 952 F.2d 426, 433 (D.C. Cir. 1991); see 
also National Ass'n of Regulatory Utility Comm'rs v. ICC, 41 
F.3d 721, 730 (D.C. Cir. 1994).

 Neither factor is present in this case. The intervenors 
were aggrieved by the Commission having authorized the 
TMI satellite to provide service to METs in the United States 
without opening up a space station round; therefore, they had 
the incentive and the ability to file their own petition for 
review. And resolution of the intervenors' issue is neither a 
necessary nor even a logical antecedent to the resolution of 
the petitioners' issue; if anything, the opposite is true. We 
therefore do not consider the intervenors' challenge.

 III. Conclusion

 For the foregoing reasons, AMSC's petition for review is

 Denied.