**KING CURB, a Division of Span Construction and Engineering, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 01–1247.

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 2002.

Decided June 7, 2002.

848

Patrick W. Jordan argued the cause and filed the briefs for petitioner.

Kathleen E. Lyon, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Sharon I. Block, Supervisory Attorney.

Before: SENTELLE, RANDOLPH, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

King Curb petitions for review, and the National Labor Relations Board cross-pe-

titions for enforcement, of a Board order finding the company in violation of § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5). The questions in the case center on whether the Board, through its Regional Director, properly determined that former employees of the company were eligible to vote in a representation election, in which the Sheet Metal Workers International, Local Union 162, AFL–CIO, prevailed.

King Curb is in the metal fabrication business. Located in Madera, California, the company fabricates fittings—"curbs"—used for skylights, building ventilation and roof access systems. Its parent company—Span Construction and Engineering, Inc.—erects shells of large commercial buildings. Ninety-eight percent of King Curb's products are used in Span's buildings. Span's main customer, Costco, accounts for 60 percent of Span's business.

King Curb operates year round, but it experiences seasonal fluctuations because its business is tied to Span's construction projects. Typically, the fall, winter and early spring are King Curb's slow times, with production rising in the summer. As production levels ebb and flow, so do the company's staffing levels. In 1996, for example, King Curb employed between 10 and 12 employees for seven months of the year, with a high of 14 employees in June and July and a low of 7 in November and December. In 1997, the staffing level remained constant at 11 employees throughout the year except for June and July, when it decreased to 10 employees. In 1998, King Curb employed between 9 and 13 workers for eight months of the year, with a low of 7 in May and a peak of 21 in August. In 1999, the staffing level ranged from a low of 13 in January to a high of 22 in June.

In 2000—the year at issue—King Curb employed 15 workers in January, 17 from

February through April, 19 in May, 24 in June and July, and 26 in August. When the company then received a request for curbs for ten Costcos, three of which were large regional distribution centers, it added new employees to its roster in September and October 2000, causing staffing levels to swell to 31 in September and 46 in October. On November 3, 2000, the union filed a representation petition with the Board, seeking to represent all of King Curb's regular and part-time employees engaged in the fabrication of sheet metal. Shortly thereafter, Costco delayed taking delivery of some of the curbs it had ordered. This caused King Curb to lay off many of its workers. By November 21, 2000—the day the Board held a representation hearing—the company's employee roster had dropped to 13. The Board's Regional Director issued a decision on December 20, 2000, directing an election. He determined that, in addition to the workers employed at the time of the election, all laid-off employees who had worked a minimum of 15 days in either of the two 3–month periods preceding his decision and direction of election had a reasonable expectation of recall and were therefore eligible to vote in the election. This eligibility formula, according to the Regional Director, indicated that there were approximately 30 employees in the unit. (The formula ultimately yielded 40 employees eligible to vote.)

The Board denied the company's request for review, and the election took place on January 18, 2001. In all, there were 22 votes for the union, 9 votes against, and 5 challenged ballots. The Board therefore certified the union as the employees' exclusive bargaining representative. The company refused to bargain, precipitating the unfair labor practice charges. The company argues here, as it did unsuccessfully in defense to the charges, that the Board's eligibility formula was arbitrary and contrary to precedent.

■ The Board has "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *See NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946). Board eligibility decisions therefore stand unless they are irrational, contrary to precedent, or "without justification in law or reason." *See id.* at 332, 67 S.Ct. at 329; *see also Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1178 (D.C.Cir.2000); *DIC Entertainment v. NLRB*, 238 F.3d 434, 436 (D.C.Cir. 2001).

■ Eligibility formulas are used to ascertain which individuals work for an employer with sufficient continuity and regularity so as to establish their community of interest with other unit employees. *See generally Sitka*, 206 F.3d at 1178. "Ordinarily the Board uses a simple formula to determine who is eligible to vote in a representation election: Employees in the bargaining unit are eligible to vote if they were employed on the date of the election and 'during the payroll period ending immediately prior to the Decision and Direction of Election.'" *Id.* (quoting *Saltwater, Inc.*, 324 N.L.R.B. 343, 343 n. 1, 1997 WL 568727 (1997)). But employment situations may differ, and "the Board has an 'obligation to tailor [its] general eligibility formulas to the particular facts of the case.'" *Sitka*, 206 F.3d at 1178–79 (quoting *BB&L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C.Cir.1995)); *see also American Zoetrope Prods., Inc.*, 207 N.L.R.B. 621, 623, 1973 WL 4656 (1973). When employees are temporary or seasonal, the Board has attempted to devise alternative formulas designed " 'to permit optimum employee enfranchisement and free choice, without

enfranchising individuals with no real continuing interest in the terms and conditions of employment offered by the employer.'" *DIC Entertainment*, 238 F.3d at 436 (quoting *Trump Taj Mahal Casino Resort*, 306 N.L.R.B. 294, 296, 1992 WL 27705 (1992)).

■ Here the Board adopted an eligibility formula that looked to: (1) whether the employees had worked a minimum of fifteen days in either of the two 3-month periods immediately preceding the date of the issuance of the direction of election; and (2) the employees' eligibility for future employment with King Curb. The Board borrowed from *Daniel Ornamental Iron Co.*, 195 N.L.R.B. 334, 1972 WL 7301 (1972), which utilized the same eligibility formula.

Daniel Ornamental was engaged in the fabrication of ornamental iron. It operated year-round, employing regular fulltime welders as well as extra part-time welders that it called upon during peak production periods. *Id.* The part-time welders came from a pool of 27 "on-call" welders, and many of them had substantial histories of employment with the company. *Id.* The Board therefore concluded that it was equitable to include in the unit all part-time employees who had worked a minimum of fifteen days in either of the two 3-month periods immediately preceding the date of issuance of the direction of election. *Id.* at 334-35.

King Curb argues that the Board erred in applying *Daniel Ornamental*'s eligibility formula without explaining why its laid-off employees had any continuity or regularity of employment, or why the *Daniel Ornamental* formula fit this case. We agree. There are, to be sure, some similarities between this case and *Daniel Ornamental*. For example, both of the companies were year-round employers with peak production periods. But there are also significant differences between the two cases— the most notable being that unlike the "oncall" welders in *Daniel Ornamental*, the employees in this case were hired by King Curb for a very brief period to meet a short-lived and unprecedented spike in demand. Nowhere did the Board explain why it was appropriate to enfranchise these individuals. Nor did the Board discuss the evidence showing that King Curb had no plans to increase production to its October 2000 levels ever again. *Cf. Heatcraft*, 250 N.L.R.B. 58, 58, 1980 WL 12010 (1980) (holding that laid-off employees were not eligible to vote when the employer had "no plans to recall employees in the near future" due to a severe decline in the homebuilding industry). In addition, the Board failed to address evidence indicating that very few of the employees King Curb had laid off in the past had ever been reemployed by the company. Finally, the Board did not mention the Regional Director's mistaken assumption that the eligibility formula he devised understated the number of eligible employees by 25 percent: he thought the formula enfranchised 30 employees when it actually enfranchised 40. It is one thing to approve a formula that is expected to yield a unit that includes only 4 more employees than were working just prior to a one-time surge in the unit's work. It is quite another, however, to approve a formula that, while predicated on the former assumption, actually yields 14 (54 percent) more employees—and to do so without explaining why the mistaken calculation does not render the formula inappropriate.

In short, the Board's decision was devoid of reasoning and explanation, and we therefore are unable to conclude that the Board met its "'obligation to tailor [its] general eligibility formulas to the particular facts of the case.'" *Sitka*, 206 F.3d at 1178-79 (quoting *BB&L, Inc.*, 52 F.3d at

369). Accordingly, King Curb's petition for review is granted, the Board's order is vacated, and the case is remanded to the Board for an explanation of why the *Daniel Ornamental* formula was appropriate here, or for the development of an eligibility formula that is adequately justified and tailored to the facts of this case.

*So ordered.*